FILED

2012 Jan-24  PM 02:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| MARY ANN HENDERSON | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. CV 11-J-00834-NE |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on the record. This court has jurisdiction pursuant to 42 U.S.C. § 405. The plaintiff is seeking reversal or remand of a final decision of the Commissioner. All administrative remedies have been exhausted.

### Procedural Background

Plaintiff[1] applied for Supplemental Security Income on February 21, 2008, alleging an inability to work beginning February 22, 2006 (R. 111-17). The protective filing date is February 28, 2008 (R. 132). Plaintiff alleges disability due to a number of ailments, the most significant being debilitating back pain and depression (R.66-69, 136). The Administrative Law Judge ("ALJ") reached a determination that

---

[1] Some of plaintiff's medical records list her under married name from a prior marriage, "Mary Mooney."

1

plaintiff was not disabled at any time through the date of his decision, October 20,

2009 (R. 26). The Appeals Council denied plaintiff's request for review on January

21, 2011 (R. 1-3). The ALJ's decision thus became the final order of the

Commissioner. *See* 42 U.S.C. § 405(g). This action for judicial review of the agency

action followed (doc. 1). The court has considered the entire record and whether the

decision of the ALJ is supported by substantial evidence. For the reasons set forth

below, the decision of the Commissioner is due to be **REVERSED**.

### Factual Background

The plaintiff is a female born on October 2, 1966, with an eleventh-grade

education (R. 58). At the time of her hearing before the Administrative Law Judge on

May 20, 2009, plaintiff had three children, all of whom were eighteen or older (R.

57). Plaintiff's most recent job was as a sales and credit manger at Lorch's Diamond

Center, where her duties consisted of checking credit applicants' credit histories,

"calling and trying to get people to come in and pay," repossessing merchandise, and

general handling and maintenance of merchandise (R. 60-62). She worked in this

position for approximately six and a half years in total (R. 61). In February of 2005

plaintiff had back surgery, after which she was off of work for "about a year," at

which point she returned to work at Lorch's under "limited duty" for just over five

months (R. 61-62). In June of 2006 plaintiff quit working and has not worked since

(R. 62). Plaintiff's jobs prior to her work at Lorch's include work at a gas station, where her responsibilities included "cashier and stocking the cooler" (R. 62), and as a certified nursing assistant (R. 64). Plaintiff receives food stamps (R. 80).

Plaintiff filed a disability claim on February 21, 2008, alleging disability beginning on February 22, 2006 (R. 111-17). The protective filing date is February 28, 2008 (R. 132). Plaintiff's disability claims are related to a number of ailments which plaintiff alleges she has suffered over a period of years. Her chief complaint relates to back pain, and associated leg pain, which had bothered plaintiff for about six months before she had surgery to relieve the pain in February 2005 (R. 66-68). Plaintiff's surgery consisted of a lumbar fusion, and plaintiff still has "hardware" in her back (R. 68). Even after the surgery, plaintiff continues to take numerous medications for her back pain, including Methadone, Lyrica, and Soma (R. 69). Plaintiff avers that the medication does not relieve the pain completely; on a scale of zero to ten, with ten being the worst, plaintiff rates her pain at "nine-and-a-half" without the medicine and about "seven" with the medicine (R. 70). Plaintiff testified that due to her pain, she can only sit in a chair or stand upright for about fifteen minutes each, and that lying down relieves her pain the most (R. 71). Plaintiff estimated that she spends "[p]robably four to five" hours between 8 a.m. and 5 p.m. lying down, and that she cannot make it through the day without lying down (R. 72,

90). Plaintiff's treating physician, Dr. Lorn Miller, a board-certified neurologist, testified that it would be medically advisable for plaintiff to lie down off and on during the day in order to take the pressure off her spine and relieve her pain, at "minimum" at least fifteen minutes every two hours, and more frequently if necessary (R. 511-15). Plaintiff says that due to her pain, she is only able to sleep about five hours per night, if that much, and frequently wakes up during the night (R. 72). Plaintiff claims she cannot safely lift more than "a gallon of milk" at one time (R. 72). Plaintiff seldom drives a car, and rarely leaves the house other than to visit the doctor (R. 77-78). Plaintiff's sister says that plaintiff is generally unable to perform most light house or yard work, and so the sister helps out at plaintiff's home two days a week (R. 160-62).

The record indicates that plaintiff has a history of IV drug abuse (R. 178, 181). This portion of the record contradicts Dr. Miller's testimony that plaintiff does not have a history of drug abuse (R. 497). Plaintiff received a diagnosis of hepatitis C from a Methadone clinic in 2003, but subsequent screening indicated that plaintiff did not appear to have this disease (R. 178-79). Dr. Miller testified in 2009 that plaintiff does have hepatitis C, and that this condition will ultimately be fatal to plaintiff (R. 494-98). Plaintiff's ultimate status with respect to hepatitis C is unclear from the record.

Plaintiff also complains of suffering from depression and problems with "nerves," which she asserts has been exacerbated by her back pain (R. 72-73, 75). She takes Xanax and Lexapro for her depression (R. 74). Plaintiff suffers from Irritable Bowel Syndrome (R. 75). Plaintiff claims to have hepatitis C, which she says causes her not to have any energy or stamina (R. 76). Dr. Miller testified that plaintiff also has attention deficit disorder, chronic muscle spasms, mitral valve prolapse, and bradycardia, but there is nothing else in the record pertaining to these diagnoses (R. 492-93). He also testified that plaintiff's mitral valve prolapse "predisposes her to panic attacks and anxiety in addition to her normal nervousness and her depression," (R. 507) and that she "has marked limitations in her ability to interact with people and function" (R. 518).

Plaintiff first visited a doctor on October 12, 2004, complaining of pain at a level of "8/10" that began seven months earlier and consisted of "aching, sharp, burning, continuous, nagging and numb [pain] which occasionally shoots and stabs down into her right hip and posterior aspect of her upper leg" (R. 211, 205, 208, 436). An MRI revealed a herniated disc at L5-S1 with possible right S1 nerve root entrapment and right foraminal stenosis, as well as L5-S1 spondylosis (R. 194, 205, 211). Plaintiff subsequently received multiple epidural injections as a conservative measure for treating her back pain (R. 205, 208, 211; *see generally* R. at 417-47 for

plaintiff's history with conservative pain treatments prior to surgery). In February 2005 plaintiff underwent L5-S1 anterior lumbar interbody fusion with allograft, autograft, and decompression to alleviate her back and bilateral leg pain (R. 195-96, 448-49). Plaintiff's treating physicians for the epidurals were Drs. Kevin Greene and Lynn Mishkel, and her surgeon was Dr. Mark Prevost (R. 195, 205, 208, 211).

Plaintiff's first follow-up appointment was on May 11, 2005, where her treating physician,[2] Dr. Miller, described her recovery as proceeding on a normal course (R. 299). Plaintiff was taking an excessive amount of medication at the time, including the following: Xanax, 1mg/twice daily;[3] Adipex, 37.5 mg/daily;[4] Zelnorm, 6 mg/daily;[5] Soma, 350 mg/thrice daily;[6] Baclofen, 20 mg/daily at bed;[7] Protonix, 40

---

[2] Here the record lists plaintiff's primary physician, who also referred her to Dr. Miller, as a Dr. Bill Yates. *See* R. at 362.

[3] Xanax is a brand name of Alprazolam, which is used in the treatment of anxiety and panic disorder. *See* Physicians' Desk Reference 117 (PDR Network, LLC, 2012).

[4] Adipex is a brand name of Phentermine, which is used in the treatment of obesity. *See* Physicians' Desk Reference 125 (PDR Network, LLC, 2012).

[5] Zelnorm is a brand name of Tegaserod, which is used "to relieve pain, bloating, and constipation caused by irritable bowel syndrome in women whose main symptom is constipation." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000251/ (last visited January 12, 2012).

[6] Soma is a brand name of Carisoprodol, which is used in the treatment of muscle spasms, musculoskeletal conditions, and pain. *See* Physicians' Desk Reference 118 (PDR Network, LLC, 2012).

[7] Baclofen is a generic drug used in the treatment of muscle spasms and other musculoskeletal conditions. *See* Physicians' Desk Reference 118 (PDR Network, LLC, 2012).

mg/daily;[8] Ibuprofen, 200 mg/twice daily;[9] Tums, one tablet/four times daily;[10] and

Methadone, 10 mg/four times daily (R. 330).[11] The record also indicates that the

physician[12] recommended that plaintiff engage in daily stretching and consult a

"relaxation tech[nique] book to help her learn how to relax the muscles" (R. 330).

Plaintiff's follow-up for her back occurred with Dr. Miller on November 22,

2005. Plaintiff reported that she continued to have intermittent pain in the low back

and the left leg which had increased in severity in the preceding month (R. 362). On

this visit, plaintiff's current medications were listed as follows: Lexapro, 10

---

[8] Protonix is a brand name of Pantoprazole Sodium, which is used in the treatment of gastroesophageal reflux disease ("GERD"). *See* Physicians' Desk Reference 125 (PDR Network, LLC, 2012).

[9] Ibuprofen is a generic drug used in the treatment of numerous conditions, most notably fever and pain. *See* Physicians' Desk Reference 122 (PDR Network, LLC, 2012).

[10] Tums is a brand name of Calcium Carbonate, which is used both as a dietary supplement to increase the amount of calcium intake and as an antacid to relieve heartburn, acid indigestion, and upset stomach. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000035/ (last visited January 12, 2012).

[11] Methadone is a generic drug used for the treatment of chronic pain. *See* Physicians' Desk Reference 124 (PDR Network, LLC, 2012).

[12] The records from plaintiff's back surgeries were delivered to the court in a completely random (i.e., non-chronological) order, and some of the records from individual physician visits appear to have been separated from each other. There are two records from a physician visit by plaintiff on May 11, 2005; however, only one (*see* R. at 299-300) is signed by a physician, Dr. Lorn Miller. The other (*see* R. at 330) contains handwritten notes that contain no obvious signature or physician name.

mg/daily;[13] Methadone, 10 mg/four times daily; Soma, 350 mg/thrice daily; Tums, one tablet/four times daily; Xanax, one tablet/twice daily; Zelnorm, one tablet/daily; Lasix, 20 mg/daily;[14] Ibuprofen, 200 mg/twice daily; Baclofen, 20 mg/daily at bedtime; Prevacid, 30 mg/daily;[15] and Adipex, 37.5 mg/daily (R. 362). Subsequent follow-up appointments on December 22, 2005, and February 17, 2006, showed no substantive changes to plaintiff's condition or medication regimen; she continued to suffer from "aching and throbbing lower back pain," and was encouraged to stretch and exercise in order to improve her cardiovascular and back strength (R. 365-74). Plaintiff was prescribed Lyrica, 50 mg/twice daily,[16] to begin taking after the December visit (R. 369).[17]

---

[13] Lexapro is a brand name of Escitalopram, which is used in the treatment of depression and general anxiety disorder. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000214/ (last visited January 12, 2012).

[14] Lasix is a brand name of Furosemide, which is used to treat, *inter alia*, hypertension. *See* Physicians' Desk Reference 122 (PDR Network, LLC, 2012).

[15] Prevacid is a brand name of Lansoprazole, which is used for the treatment of GERD. *See* Physicians' Desk Reference 123 (PDR Network, LLC, 2012).

[16] Lyrica is a brand name of Pregabalin, which is used for the treatment of neuropathic pain, which occurs most often in the extremities. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000327/ (last visited January 12, 2012).

[17] The records indicate that plaintiff would be prescribed Lyrica off and on for the next several years in order to treat pain in her legs, which was not constant and would come and go from time to time. *See, e.g.*, R. at 269 (records show that plaintiff begins taking Lyrica again in August, though they do not specify when, after the December 22, 2005, visit, she ceased taking it).

On March 17, 2006, plaintiff's physician noted that she continued to suffer from "intermittent low back pain" and that she was not doing any back exercises (R. 249). On April 14, 2006, Dr. Miller noted that plaintiff's pain levels remained unchanged, but that she had begun to do back exercises and stretches one to two times a day, and that plaintiff reported that the Methadone controls her pain and she was tolerating it well (R. 255). On June 9, 2006, plaintiff reported that though she had continued to do her exercises, her pain had increased, which she attributed to having to do heavy lifting and bending at work (R. 260). Dr. Miller reported that plaintiff said on days when her pain was more severe, she took one to two tablets more of her Methadone than she was prescribed. *Id.* Plaintiff requested that her Methadone dosage be increased, but Dr. Miller declined to do so (R. 260, 264).

On August 11, 2006, plaintiff's pain levels remained unchanged, though Dr. Miller did note that the pain severity appeared to increase with activity (R. 265). On October 6, 2006, plaintiff reported an increase in pain "with more stress," and Dr. Miller noted that plaintiff had stopped working and was out of Methadone because she was taking more than her prescribed dosage due to the pain increase (R. 270). The pain had become so bad that plaintiff visited her primary physician, Dr. Yates, and received additional pain medication. *Id.* On November 30, 2006, plaintiff reported that her pain level had again increased, described the pain as "constant stabbing," and

9

said that she was "unaware of any injury or activity" that would have caused the increase in pain (R. 227). Plaintiff continued to do her back exercises, but they did not appear to help relieve the pain. *Id.* Plaintiff was again taking Lyrica. *Id.*

The records indicate that at some point prior to visiting Dr. Miller on November 30, 2006, plaintiff had begun taking Effexor, 75 mg/daily,[18] but complained that it had not been effective in controlling her depression (R. 227). Plaintiff accordingly began taking Wellbutrin, 150 mg/daily before noon,[19] (R. 231), which she reported to Dr. Miller on January 24, 2007, was "very effective" in controlling her depression (R. 275).

Plaintiff's condition remained largely unchanged on March 30, 2007, except that she reported she could no longer take the Baclofen because "it makes her feel too fatigue [sic] the following morning" (R. 280). Plaintiff was also given a steroid injection for her lower back pain (R. 280, 285). During plaintiff's next visit, on May 25, 2007, she reported to Dr. Miller that her back pain was now "constant" and "stabbing" and had increased in severity in response to stressful family circumstances (R. 286). In response to this, plaintiff again took more Methadone than she was

---

[18] Effexor is a brand name of Venlafaxine, which is used for the treatment of depression. *See* Physicians' Desk Reference 127 (PDR Network, LLC, 2012).

[19] Wellbutrin is a brand name of Buproprion, which is used for the treatment of depression. *See* Physicians' Desk Reference 118 (PDR Network, LLC, 2012).

prescribed, "an extra tablet every once in a while" (R. 286). Plaintiff also reported that her depression had worsened because she was under a considerable amount of stress; plaintiff's daughter had become pregnant at age sixteen and was unmarried, and plaintiff's sixteen-year old son had been diagnosed with two aneurysms (R. 286). Plaintiff reported that she had "been more nervous, crying a lot and [was] irritable." *Id.* In addition to the medications plaintiff had been taking, Dr. Miller prescribed plaintiff Xanax, 1 tablet/daily, which plaintiff had taken previously, and Toprol XL, 25 mg/daily[20] (R. 291).

Plaintiff's condition with respect to her back pain was unchanged on July 18, 2007, but her depression had improved (R. 293). On August 27, 2007, plaintiff returned to the doctor due to a severe increase in pain, and reported to Dr. Miller that her back pain was unchanged, but that she was experiencing pain in her right thigh "as a sharp shooting electric like pain that shoots down her thigh" that was "more severe than ever before" (R. 301). Plaintiff reported that she had visited an emergency room on August 25, 2007, due to the extreme pain she was suffering, which she attributed to engaging in recreational activities, including swimming and walking,

---

[20] Toprol is a brand name of Metoprolol Succinate, which is used for the treatment of hypertension. *See* Physicians' Desk Reference 124 (PDR Network, LLC, 2012).

while on a family vacation. *Id.* Plaintiff was treated with a shot of Dilaudid (2mg)[21] and Phenergan (25 mg)[22] and a prescription for Naproxen,[23] Oxycodone,[24] and Valium[25] (R. 413). She also reported that she had been unable to do her back exercises for several days due to the severity of her pain, but that her depression had decreased in severity (R. 301). Dr. Miller administered a shot of Lidocaine in order to relieve plaintiff's thigh pain (R. 307).

Plaintiff returned to Dr. Miller on September 14, 2007, and reported that since her injection on August 27, her thigh pain had been relieved and her back pain remained manageable, but that she had not done any exercises since that visit  (R. 308). Her depression continued to improve. *Id.* After this visit, plaintiff began taking Chantix, 1.5 mg/twice daily[26] (R. 313). Plaintiff's condition was unchanged on

---

[21] Dilaudid  is a brand name of Hydromorphone, which is used for the treatment of severe pain. *See* Physicians' Desk Reference 122 (PDR Network, LLC, 2012).

[22] Phenergan is a brand name of Promethazine, which is used for the treatment of pain and severe nausea. *See* Physicians' Desk Reference 126 (PDR Network, LLC, 2012).

[23] Naproxen is a generic drug used to treat pain, tenderness, swelling and stiffness. *See* Physicians' Desk Reference 124 (PDR Network, LLC, 2012).

[24] Oxycodone is a generic drug used to treat pain. *See* Physicians' Desk Reference 125 (PDR Network, LLC, 2012).

[25] Valium is a brand name of Diazepam, which is used in the treatment of anxiety, muscle spasms, and seizures. *See* Physicians' Desk Reference 120 (PDR Network, LLC, 2012).

[26] Chantix is a brand name of Varenicline, which is used to help people stop smoking. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000351/ (last visited January 12, 2012).

November 9, 2007 (R. 315).

On January 4, 2008, plaintiff reported to Dr. Miller that her back pain had increased in severity, but that her depression was manageable as long as she continued to take the Xanax or Wellbutrin (R. 325). Her pain had not worsened on February 29, 2008, but neither had it improved (R. 331). By March 25, 2008, her pain had again worsened, and plaintiff was again "unaware of any activity, injury or illness that may be contributing to the low back pain" (R. 336). She reported that the pain "increases in severity when [she] stands or walks for longer than thirty minutes," and that Methadone "makes her low back pain tolerable, but only [for] about two hours." *Id.*

Dr. John Goff, a psychologist in Jasper, evaluated plaintiff on May 12, 2009 (R. 521).[27] He found a number of impairments to plaintiff's ability to function normally in a professional environment. He noted that plaintiff suffered at minimum a "mild" impairment on every single factor for which she was evaluated (R. 523-24). Most significantly, plaintiff showed "moderate" impairment on her ability to "[d]eal with changes in a routine work setting," "[u]nderstand, remember, and carry out detailed or complex instructions" and "[m]aintain activities of daily living"; "marked"

---

[27] There is a slight discrepancy in the record with respect to the dates of this evaluation; Dr. Goff's evaluation lists "12 May 2009" as the "date seen" (R. 521), but his medical source opinion form is dated 14 May 2009 (R. 524).

impairment on her ability to "[r]espond appropriately to supervisors," "[r]espond appropriately to co-workers," "[r]espond appropriately to customers or other members of the general public," "[m]aintain attention concentration or pace for periods of at least two hours," and "[m]aintain social functioning"; and "extreme" impairment on her ability to "[r]espond to customary work pressures" (R. 523-24). Dr. Goff's summary notes indicate his impression that plaintiff "is not functioning at a very high level cognitively" and that plaintiff "is obtaining IQ test scores right at the cusp between mild mental retardation and borderline intellectual functioning," but that he did "not think she is mentally retarded" (R. 530). He instead observed that "it is her discomfort which is the major interfering factor in regard to her ability to deal with the stresses and pressures of the workplace." *Id.* His final conclusion was that "[t]he combination of difficulties present here including her discomfort, her preoccupation with her pain and her generally low level cognitive functioning would seem to represent a severe impairment" (R. 531). Notably, this opinion is in accord with Dr. Miller's, who, when asked if he "kn[e]w of any way that [plaintiff] could possibly hold up to an eight hour a day physically or mentally on any sustained basis in a work environment," replied "No. Sadly, no." (R. 519).

At the hearing before the ALJ, the Vocational Expert ("VE") was presented with numerous hypothetical situations involving an individual with symptoms similar

to the plaintiffs'. On the first hypothetical, the VE testified that for a younger female with limited education who is able to perform "medium work" with the restrictions of "occasional bending, stooping, or pushing or pulling involving her upper extremities and right-lower extremity," no driving, no unrestricted heights, and with the ability to sit or stand at her option, there would be no "medium work opportunities" in which the individual could engage, but that "[a] very limited range of light work" would be feasible, such as "cashier jobs . . . [at] a counter or window" where excessive bending was not required, "tending," and "[i]nspection [and] sorting" jobs (R. 93-95). There would also be "sedentary jobs" available such as a cashier at a parking lot, "non-complex clerical jobs such as information clerk, telephone answering clerk, [or] hosting clerk," and jobs in telephone-order sales and non-production assembly jobs (R. 95). With respect to the plaintiff specifically, the VE testified that she would not be able to return to any of the work activities that she held previously (R. 96).

On the second hypothetical, identical to the first but with the added restriction of no bending or stooping at all, the VE testified that the individual would not be able to perform any of the light jobs or sedentary jobs that he previously identified (R. 96-97). On the third hypothetical, involving an individual who needed to lie down during the regularly scheduled work tour for four to five hours, the VE testified that such

15

individual would be unable to perform any of the jobs identified (R. 97). On the final

hypothetical, the VE testified that chronic "moderately severe to severe pain," or pain

between seven and ten on a zero-to-ten scale, would preclude an individual from all

work activity (R. 98).

When plaintiff's attorney asked the VE whether plaintiff herself, assuming her

testimony as to her condition is truthful, would be able to perform any job in the

national economy, the VE responded that she would not (R. 99).

### Standard of Review

In a Social Security case, the initial burden of establishing disability is on the

claimant, who must prove that due to a mental or physical impairment he is unable

to perform his previous work. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

If the claimant is successful, the burden shifts to the Commissioner to prove that the

claimant can perform some other type of work existing in the national economy. *Id.*

This court's review of the factual findings in disability cases is limited to

determining whether the record contains substantial evidence to support the ALJ's

findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g);

*Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Martin v. Sullivan*, 894 F.2d 1520,

1529 (11th Cir. 1990). "Substantial evidence" is generally defined as "such relevant

evidence as a reasonable mind would accept as adequate to support a conclusion."

16

*Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

This court also must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988); *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987); *Davis v. Shalala*, 985 F.2d 528 (11th Cir. 1993). No presumption of correctness applies to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *Brown v. Sullivan*, 92 F.2d 1233, 1235 (11th Cir. 1991); *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991). Furthermore, the Commissioner's "failure to . . . provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius*, 936 F.2d at 1145-46.

When making a disability determination, the ALJ must consider the combined effects of all impairments. *Davis*, 985 F.2d at 534; *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990); *Walker*, 826 F.2d at 1001. When more than one impairment exists, the plaintiff may be found to be disabled even though none of the impairments considered alone would be disabling. *Walker*, 826 F.2d at 1001. The ALJ must evaluate the combination of impairments with respect to the effect they have on the

plaintiff's ability to perform the duties of work for which he or she is otherwise capable. *Lucas v. Sullivan*, 918 F.2d 1567, 1574 (11th Cir. 1990). Merely reciting that the plaintiff's impairments in combination are not disabling is not enough. The ALJ is required to make specific and well-articulated findings as to the effect of the combination of impairments. *Walker*, 826 F.2d at 1001.

### Legal Analysis

In this case, the ALJ found that the plaintiff "has the 'severe' impairments of failed back syndrome, four years status post L5-S1[sic] fusion, hepatitis C, depression and anxiety, however, the claimant does not have an impairment or combination of impairments, which meets or equals a listing in Appendix 1 to Subpart P" (R. 20, 25). Regardless, the ALJ denied plaintiff benefits, finding that plaintiff "retains the residual functional capacity to perform sedentary work which allows her to sit or stand at will, occasionally bend, stoop, and push or pull with the upper extremities and right lower extremity," provided that plaintiff "not drive or work around unprotected heights" (R. 24).

The ALJ's findings are simply not supported by substantial evidence. Indeed, the ALJ appears to have selectively considered the evidence in reaching his conclusions. The ALJ's conclusion appears to be based on several instances throughout plaintiff's years of medical treatment in which she indicated that her

physical and mental impairments were at tolerable levels and on the fact that her doctors never formally "assign[ed]" plaintiff the "restrictions," such as lying down for several hours per day, that plaintiff requires to manage her back pain (R. 21). For example, the ALJ highlights that three months after plaintiff went on vacation in August 2007, she reported "no increase or decrease in her back pain, and that her medications made her pain <u>tolerable</u>" (R. 21) (emphasis in original). The ALJ also emphasized that an examination several months after March 2008[28] "revealed <u>no</u> spasms or deformities" and that plaintiff "had full range of motion of the dorolumbar spine, and a normal neurological examination," and "only mild degenerative changes at L2-3 and mild annular bulge." *Id.* (emphasis in original). He then opined that "[a]lthough Dr. Miller opined at his deposition that [plaintiff] suffered disabling back symptomotolgy [sic], a careful review of the objective, clinical findings, fails to substantiate his testimony" *Id.*

The record in no way substantiates the ALJ's conclusion. Dr. Miller testified that he has seen plaintiff on over forty separate occasions since January of 2005, and that he could discuss her case without even referring to her chart (R. 491). His testimony regarding plaintiff's limitations (*see* R. at 504-07) represents the diagnosis

---

[28] The ALJ did not cite to evidence in the record for this conclusion, so it is unclear what exact examination he is referring to, or when it occurred.

and professional opinion of plaintiff's treating physician, and is supported both by the

testimony of Dr. Goff, with respect to plaintiff's depression and anxiety (*see* R. at

521-33) and by the testimony of the Vocational Expert before the ALJ (*see* R. at 97-

99) with respect to plaintiff's holistic condition. By inferring that plaintiff was able

to work from his selective review of the evidence, the ALJ substituted his opinion for

that of plaintiff's treating physician. "As the hearing officer, [the ALJ] may not

arbitrarily substitute his own hunch or intuition for that of a medical professional."

*Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992). The ALJ may reject the

opinion of any physician when the evidence supports a contrary conclusion.

*Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983). The ALJ is required,

however, to state with particularity the weight he gives to different medical opinions

and the reasons why. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

> Absent "good cause," an ALJ is to give the medical
> opinions of treating physicians "substantial or considerable
> weight." *Lewis*, 125 F.2d at 1440; see also 20 C.F.R. §§
> 404.1527(d)(1)-(2). Good cause exists "when the: (1)
> treating physician's opinion was not bolstered by evidence;
> (2) evidence supported a contrary finding; or (3) treating
> physician's opinion was conclusory or inconsistent with
> the doctor's own medical records." *Phillips*, 357 F.2d at
> 1241. With good cause, an ALJ may disregard a treating
> physician's opinion, but he "must clearly articulate [the]
> reasons" for doing so. *Id.* at 1240-41.

*Winschel v. Comm'r of Soc. Security*, 631 F.3d 1176, 1179 (11th Cir. 2001). In short,

20

"good cause" exists if the opinion is wholly conclusory, unsupported by the objective medical evidence in the record, inconsistent within itself, or appears to be based primarily on the patient's subjective complaints. *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); see also *Crawford v. Comm'r of Soc. Security*, 363 F.3d 1155, 1159-60 (11th Cir. 2004); *Lewis*, 125 F.3d at 1440.

The ALJ here did not have good cause for disregarding the treating physicians' opinions. No medical evidence contradicts plaintiff's physicians' conclusions. Rather, the medical records demonstrate that plaintiff's treating physician took her complaints seriously, has tried various treatments for plaintiff's symptoms, and has had only moderate success, at best, in reducing plaintiff's level of pain, which the record demonstrates has consistently been substantial since at least 2006, if not earlier. The ALJ seemed to rely on his own opinion of how a disabled person should act and then denied benefits to the plaintiff based on this preconceived profile and his mistaken belief, unsupported by evidence, that the objective medical evidence in the record is not credible because the testimony of plaintiff's treating physician provides more detail of her condition, treatment regimen, and level of impairment than selectively excerpted portions of his written notes during individual treatment sessions.

The court finds the record devoid of substantial evidence to support the decision of the ALJ. The Commissioner's "failure to apply the correct law or to

provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991). Here, multiple medical opinions concerning the nature, origins, and severity of plaintiff's pain are before the court. By inferring that plaintiff was able to work from his selective review of the evidence, the ALJ substituted his opinion for that of all of the medical reports in the file, which taken together establish that plaintiff is indeed disabled.

### Conclusion

Based on the foregoing, the court is of the opinion that the decision by the ALJ is not supported by substantial evidence, and therefore the decision of the Commissioner must be **REVERSED** and this case **REMANDED** for the calculation of benefits to which plaintiff is entitled.

**DONE** and **ORDERED** the 24th day of January 2012.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE

22